**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SAEID MOHEBBI, | Case No.  13-cv-03044-BLF |
|           Plaintiff, | |
|     v. | **ORDER** |
| | **(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION,** |
| MAHNAZ KHAZEN, et al., | **(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS,** |
|           Defendants. | **AND** |
| | **(3) STAYING CLAIMS PENDING COMPLETION OF ARBITRATION** |

[Re:  ECF 68, 69]

This case arises out of a contractual investment relationship. Plaintiff contends that he agreed to invest over $1 million into a partnership in exchange for Defendants' assistance in helping him qualify for the federal EB-5 immigrant visa program. He now seeks rescission of this investment contract, and brings a Second Amended Complaint with 22 causes of action against Defendants, who he alleges, among other things, fraudulently induced his investment.

Presently before the Court are two motions brought jointly by all Defendants: a motion to compel arbitration and a motion to dismiss. Defendants argue that the arbitration clause contained in the Engagement Agreement between the parties demands that this Court send the case to binding arbitration. Plaintiff, in contrast, argues that the arbitration clause was induced by fraud and is unconscionable, thus precluding its enforcement.

Having reviewed the papers and oral argument of the parties, and the governing law, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion to compel arbitration. The Court finds that two of Plaintiff's 22 causes of action, claims for false advertising in violation of the Lanham Act and California Business and Professions Code § 17500, fall outside the ambit

of the arbitration agreement. Plaintiff's § 17500 claim previously survived Defendants' first motion to dismiss. The Court finds that Plaintiff's Lanham Act claim states a claim upon which relief could be granted, and therefore DENIES IN PART Defendants' motion to dismiss with regard to that claim. The Court therefore STAYS Plaintiff's false advertising claims pending the completion of arbitration. The Court DECLINES TO CONSIDER Defendants' motion to dismiss with regard to claims referred to arbitration.

## I.   BACKGROUND

### A.   Procedural History

This Court previously granted in part and denied in part Defendants' motion to dismiss Plaintiff's First Amended Complaint on June 23, 2014. ECF 64. In that motion, Defendants also asked the Court to dismiss the FAC due to the arbitration clause at issue in this motion. The Court denied that request, and instructed Defendants that they could bring a motion to compel arbitration following the filing of Plaintiff's Second Amended Complaint.

Plaintiff filed his SAC on July 11, 2014. On July 25, 2014, Defendants filed their motions to compel and dismiss. Following briefing, the Court heard oral argument on the motions on November 13, 2014.

Neither party requested in its papers that the Court hold an evidentiary hearing on the motion to compel arbitration. At oral argument, the Court asked the parties on the record whether either party wanted the Court to hold an evidentiary hearing. Both parties declined, and agreed that the Court would take the motion to compel arbitration under submission on the papers.

### B.   Factual Background

The facts of this case are well-known to the Court and the parties. Plaintiff is a Farsi-speaking Iranian citizen who, in 2012, was interested in obtaining permanent residency in the United States through the EB-5 Immigrant Investor Visa Program. This program allows foreign nationals to obtain a green card if they invest a certain amount of money (generally $500,000 or $1 million, depending on certain factors) in the United States. SAC ¶ 26. While living in Iran, he learned about Defendant USIIC through an online Farsi-language video, and, in April 2012, met

with its CEO, Ms. Khazen, in Los Angeles during a trip to the United States. SAC ¶ 30.[1] In this meeting, Khazen and Plaintiff discussed ways in which Plaintiff could invest money with USIIC so as to qualify for an EB-5 visa.[2] After returning to Iran, Plaintiff received correspondence from Khazen via email regarding the terms of an investment. SAC ¶ 31.

In July 2012, Plaintiff met with Khazen and Michael Shadman in Dubai. SAC ¶ 33. At this meeting, Plaintiff contends that he was presented with an Engagement Agreement, dated July 22, 2012, which set forth the terms of Plaintiff's relationship with USIIC. *See* ECF 66-9. This six-page document, written in English, contains the arbitration clause at issue in this litigation. The clause states:

### 9.   ARBITRATION

> All disputes arising out of or relating to this Agreement shall be decided by arbitration in an international venue in accordance with the Rules of the International Chamber of Commerce (ICC) unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrator shall be final and judgment may be entered in accordance with applicable law in any court having jurisdiction. Notice of the demand for arbitration shall be filed in writing with the other Party to this Agreement and with the ICC. The demand for arbitration shall be made within two (2) years after the dispute in question has arisen. If any action is necessary to enforce any of the terms of this Agreement, the prevailing Party shall be entitled to receive from the other Party all costs and fees, including reasonable attorneys' fees, and interest at the rate set forth in this Agreement.

*Id.* at 4-5. Perhaps unsurprisingly, Plaintiff and Defendants tell conflicting stories regarding the negotiation and signing of this contract.

Plaintiff states in his SAC and opposition to the motion to compel that he was presented with this Engagement Agreement on July 22, 2012. *See* SAC ¶ 34; *see also* Pl.'s Opp. to Mot. to

---

[1] Over the next year, Plaintiff would also meet with three of the other individual defendants, Michael Shadman and Violet and Pirooz Parvarandeh, *see, e.g.*, SAC ¶¶ 33, 35, 39, though he does not allege in the SAC that he ever communicated directly or met with Stacey Conti.

[2] Plaintiff contends in the SAC that USIIC advertised itself on its website as the "only EB-5 Regional Center organization with its foundation in United States banking," despite the fact that USIIC had not been approved by United States Citizenship and Immigration Services ("USCIS") to serve as an EB-5 Regional Center. SAC ¶ 26.

United States District Court
Northern District of California

Compel, ECF 74 at 6. Plaintiff further states that, prior to the agreement being presented to him,

"all of the conversations between Defendants and Plaintiff had been conducted in Farsi because

Plaintiff only knew a few words of English." Pl.'s Opp. to Mot. to Compel at 6-7. Plaintiff's

opposition continues:

> However, the agreement was written in English. Plaintiff inquired about the contents of the agreement and Khazen explained the terms of the agreement in Farsi. At no point during this explanation did she mention the fact that USIIC's Regional Center application was pending. . . . Plaintiff signed the engagement agreement only because he had been led to believe that the USIIC was an approved regional center. Khazen concealed the pending status with intention to defraud because she knew that Plaintiff would not sign the agreement if he knew the truth. Moreover, Khazen did not mention the arbitration clause and there was no place for Plaintiff to initial under the arbitration clause to indicate that he had read and understood this clause.

*Id.* at 7; *see also* Mohebbi Decl., ECF 74-1 ¶¶ 38, 39, 43 ("The agreement was written in English.

I inquired about the contents of the agreement and Khazen explained the terms of the agreement in

Farsi. . . . I was never informed about the arbitration clause . . . . I was not aware that by signing

the documents that I would be agreeing to arbitration or giving up my right to go to court in the

event of a dispute.").

    Defendants present evidence to rebut several of the statements made by Plaintiff. First,

Khazen states in a signed declaration that not all of the prior conversations she had with Plaintiff

took place in Farsi, and that instead they spoke "primarily in Turkish, as [Mr. Mohebbi] insisted

that I must practice my Turkish." Khazen Decl., ECF 77 ¶ 3. Khazen further states that she gave

Mr. Mohebbi a "copy of USIIC's standard Engagement Agreement" on March 30, 2012, and that

this form agreement "had the same substantive terms as the version that he signed on July 22,

2012." *Id.* at ¶ 7. She states that she was informed that Mr. Mohebbi, who she says described

himself as a "successful banker," *id.* at ¶ 5, had "had all of the documents that I gave him

translated, including [] the Engagement Agreement," *id.* at ¶ 12, and that he "brought [to the July

22 meeting] a briefcase containing documents that he informed me he had translated." *Id.* at ¶ 13.

She also contends that Mr. Mohebbi negotiated aspects of the Engagement Agreement at the July

22 meeting, including the fee owed to USIIC. *Id.* at ¶¶ 14-18.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

After signing the Engagement Agreement, Plaintiff claims in his SAC that he signed two additional agreements with USIIC: an Investment Questionnaire and Subscription Agreement, on October 3, 2012, which outlined the terms of his $1,000,000 investment with Defendant USIIC LP, a limited partnership, *see* SAC Exh. 17, and a December 18, 2012 Agreement, which states that Defendants had used Plaintiff's investment to purchase 1,000,000 shares in an entity called Tri-Valley Bank, *see* SAC Exh. 19 at 2-3.[3]  Neither of these additional contracts contains an arbitration clause.

## II.   LEGAL STANDARDS

### A.   Motion to Compel Arbitration

Enforceability of an arbitration clause, and the determination of the scope of that clause, is governed by the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 1 *et seq.* Under the FAA, arbitration agreements are "a matter of contract," and "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Such generally applicable contract defenses include "fraud, duress, or unconscionability, but not [] defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011). A party seeking to invoke an arbitration agreement may petition the district court "which, save for such an agreement, would have jurisdiction [to hear the case], for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see also Trompeter v. Ally Financial, Inc.*, 914 F. Supp. 2d 1067, 1071 (N.D. Cal. 2012).

A district court faced with a petition to enforce an arbitration clause engages in a limited two-part inquiry: first, it determines whether the arbitration agreement is valid, and second, it determines whether the agreement encompasses the claims at issue. *See, e.g.*, *Mitsubishi Motors Co. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 627-28 (1985); *see also Trompeter*, 914 F. Supp. 2d at 1071 ("A district court must compel arbitration under the FAA if it determines that: (1) there exists a valid agreement to arbitrate; and (2) the dispute falls within its terms."). A district court

---

[3] Defendants contend that this December 18 agreement is unexecuted. *See* Mot. to Compel at 5.

does not consider challenges to the contract as a whole, but rather only specific challenges to the validity of the arbitration clause itself. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010) ("There are two types of validity challenges under § 2: 'one type challenges specifically the validity of the agreement to arbitrate,' and 'the other challenges the contract as a whole.' . . . [O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable.").

When determining whether the arbitration clause encompasses the claims at issue, "all doubts are to be resolved in favor of arbitrability." *Simula v. Autoliv*, 175 F.3d 716, 721 (9th Cir. 1999) (interpreting the language "arising in connection with" in an arbitration clause to "reach[] every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.").

> **B.      Motion to Dismiss Under Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) concerns what facts a plaintiff must plead on the face of his complaint. Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Any complaint that does not meet this requirement can be dismissed pursuant to Rule 12(b)(6). In interpreting Rule 8(a)'s "short and plain statement" requirement, the Supreme Court has held that plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which requires that "the plaintiff[s] plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not ask a plaintiff to plead facts that suggest they will probably prevail, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519, F.3d 1025, 1031 (9th Cir. 2008).

## III.    DISCUSSION

### A.    Choice of Law

The Engagement Agreement does not contain a choice of law provision. *See* ECF 66-9. In general, state contract law governs the interpretation of arbitration agreements. *See, e.g.*, *Farrow v. Fujitsu Am., Inc.*, 2014 WL 1396412, at *3 (N.D. Cal. Apr. 9, 2014). When a contract is silent as to its choice of law, federal common law determines which state's law applies to the contract. *See, e.g.*, *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997). In this circuit, the law of the state with the "most significant relationship to the transaction and the parties" is applied to the contract. *Chuidian v. Philippine Nat'l Bank*, 976 F.3d 561, 564-65 (9th Cir. 1992).

Here, though the Engagement Agreement was signed in Dubai, Plaintiff engaged in meetings with the Defendants in California during his 2012 trip to the United States. The contract is between USIIC, LLC, which has its principle place of business in California, SAC ¶ 9, and Plaintiff, an Iranian national who now resides in California, *see* SAC ¶ 8. California has the most significant relationship to the transaction and the parties, and, as no party asks the Court to interpret the Engagement Agreement pursuant to the law of any other state, California law governs the interpretation of the Engagement Agreement and, therefore, the arbitration clause contained within the Engagement Agreement.

### B.    The Validity of the Arbitration Clause

In his opposition, Plaintiff makes three arguments as to why the Court should decline to enforce the arbitration clause: (1) that the fraudulent execution of the contract renders the arbitration provision void; (2) that the arbitration provision itself was fraudulently induced; and (3) that the arbitration provision is unconscionable. The Court addresses each argument in turn.

#### 1.    Fraudulent Execution of the Contract

"[A] party's challenge to another provision of the contract, *or to the contract as a whole*, does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (emphasis added). Plaintiff's argument that "[c]laims of fraud in the execution of a contract are not arbitrable," Pl.'s Opp. to Mot. to Compel at 12, is simply contrary to law. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) ("There can be

United States District Court
Northern District of California

no doubt that 'contract' as used [in § 2 of the FAA] must include contracts that later prove to be void.").[4] This does not mean that Plaintiff's allegation that the Engagement Agreement was fraudulently executed will go unheard, only that such a claim is heard by an arbitrator, not the Court.

### 2.    Fraudulent Inducement of the Arbitration Provision

Plaintiff's second argument is that there was a "lack of mutual assent as to the arbitration provision," and that Defendants' fraud caused Plaintiff a "lack of a reasonable opportunity to discover the existence of the arbitration provision." Pl.'s Opp. to Mot. to Compel at 20. Plaintiff contends that "once Khazen voluntarily undertook to explain terms of the engagement agreement to Plaintiff, as she did when she reviewed the terms of the Engagement Agreement, she was under a duty to explain all of the terms of the engagement agreement completely and accurately." *Id.* at 21.  This "duty to explain," Plaintiff argues, includes a duty to inform Plaintiff that he was signing a contract that contained an arbitration provision. *See id.* This argument is unpersuasive, for several reasons.

First, the arbitration provision is plainly included on the face of the contract. The word "ARBITRATION" is written in all capital letters, bold font, and is underlined. ECF 66-9 at 4. The contract is a mere six pages long, including the signature page. The copy of the contract provided to the Court by Plaintiff is only written on one side of the page, and there is no indication that the arbitration provision was somehow "hidden" on the back of a page of the contract. *Cf. Rodriguez v. Sim*, 2009 WL 975457, at *6 ("Fraud does not render a written contract void where the defrauded party had a reasonable opportunity to discover the real terms of the contract.") (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 419-20 (1996)). When a contract's arbitration provisions are clear and conspicuous, as they are here, the party owes no duty to point them out to the other party. *See Chase v. Blue Cross of Calif.*, 42 Cal. App. 4th 1142, 1155 (1996).

Second, Plaintiff's inability to read English does not render the terms of the arbitration

---

[4] The cases cited by Plaintiff for this proposition, including *Larian v. Larian*, 123 Cal. App. 4th 751, 760 (2004), and *Ford v. Shearson Lehman Am. Express, Inc.*, 180 Cal App. 3d 1011, 1028 (1996), predate the Supreme Court's holdings in *Buckeye Check Cashing* and *Rent-A-Center*.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  agreement invalid. A party cannot avoid the terms of an agreement he signs on the ground that he

2  did not understand the language in which the contract was written. *See, e.g.*, *Madden v. Kaiser*

3  *Found. Hospitals*, 17 Cal. 3d 699, 710 (1976) (stating the "general rule that one who assents to a

4  contract is bound by its provisions and cannot complain of unfamiliarity with the language of the

5  instrument"). Courts in California and across the country have consistently held that a party cannot

6  avoid an arbitration clause simply because the contract is written in another language. *See id.;*

7  *Bolanos v. Khalatian*, 231 Cal. App. 3d 1586, 1590 (1991) (holding that an arbitration clause, like

8  any other contract clause, cannot be avoided merely because of an inability to read the language in

9  which it was written); *see also Gerike v. Rent-A-Center, Inc.*, 2014 WL 3592094 (D.P.R. June 27,

10  2014) ("Moreover, the fact that the document was in Spanish, a language unfamiliar to [plaintiff]

11  at the time, also does not negate her consent."); *Modern Space Design & Decoration (Shanghai)*

12  *Co. v. Lynch*, 2014 WL 4897322 (N.D. Ill. Sept. 29, 2014); *Torres v. Major Auto. Grp.*, 2014 WL

13  4802985 (E.D.N.Y. Sept. 25, 2014). This is particularly true when the contracting parties are

14  sophisticated entities, as here – Plaintiff was a businessman who was signing a contract to invest at

15  least $1 million with USIIC in exchange for, he believed, their assistance in helping him obtain an

16  EB-5 visa. *See, e.g.*, SAC ¶ 22.

17         Plaintiff's argument that Khazen undertook a duty to translate the document for him, and

18  translated it incompletely in order to obfuscate the presence of the arbitration agreement, is

19  similarly unavailing. Mr. Mohebbi's declaration states only that he "inquired about the contents of

20  the agreement and Khazen explained the terms of the agreement in Farsi." Mohebbi Decl. ¶ 39. In

21  contrast to this statement, Khazen's declaration includes several pieces of uncontested evidence

22  that support an inference that she did not undertake any affirmative duty to translate the

23  Engagement Agreement. She first states that she gave Mr. Mohebbi a form copy of the

24  Engagement Agreement on March 30, nearly four months prior to the July 22 meeting in which he

25  signed the Engagement Agreement. Second, she points to an email from Fetneh Seif, the tour

26  guide that Mr. Mohebbi declares arranged a meeting between him and Ms. Khazen, *see* Mohebbi

27  Decl. ¶ 13. This email states that Mr. Mohebbi obtained translations of the documents Ms. Khazen

28

1    had provided him. *See* Khazen Decl. ¶ 12 Exh. B.[5] Finally, she states that Mr. Mohebbi "brought a

2    briefcase containing documents that he informed me he had translated" and attempted to negotiate

3    terms of the Engagement Agreement, including the administrative fee. *Id.* at ¶¶ 13-14.

4         Plaintiff does not rebut the statements made in Ms. Khazen's declaration, and as such does

5    not meet his heavy burden to show that Khazen undertook an affirmative duty to translate the

6    document for him, let alone that she then translated that document incorrectly and purposefully hid

7    from him the existence of the arbitration clause.[6]

8                                    *3.      Unconscionability*

9         To be unenforceable under California law, a particular contract provision must be both

10   procedurally and substantively unconscionable. *Armendariz v. Found. Health Psychcare Servs.*, 24

11   Cal. 4th 83, 114 (2000). Though both elements must be present, they need not be shown to the

12   same degree – "the more substantively oppressive the contract term, the less evidence of

13   procedural unconscionability is required to come to the conclusion that the term is unenforceable."

14   *Id.*; *see also A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 487 (1982). Procedural

15   unconscionability focuses on whether the contract was signed under conditions of oppression or

16   surprise, or if the contract was one of adhesion. *See Flores v. Transamerica HomeFirst, Inc.*, 93

17   Cal. App. 4th 846, 853 (2001). In contrast, substantive unconscionability is concerned with

18   whether the contract is "overly harsh" or "generates one-sided results." *See Armendariz*, 24 Cal.

19   4th 83, 114; *see also Concepcion*, 131 S. Ct. 1740, 1746.

20        The Court first considers whether the contract is procedurally unconscionable. The contract

21   is not one of adhesion, which requires it be "imposed and drafted by the party of superior

22   bargaining strength, [and] relegates to the subscribing party only the opportunity to adhere to the

23

24   ─────────────────
     [5] The Court considers this statement not for the truth of the matter asserted, but rather to show Ms.
25   Khazen's reasonable belief that Mr. Mohebbi had the documents translated, making it unlikely
     that she would undertake an obligation to translate the Engagement Agreement for him at the July
26   22 meeting.

27   [6] Further, the undisputed evidence that Khazen gave Plaintiff a form copy of the Engagement
     Agreement four months prior to his signing the Agreement, Khazen Decl. ¶ 7, means that Plaintiff
28   had sufficient time to seek out translation of the document, and thus should be bound by its terms
     even if he elected not to do so. *Cf. Madden v. Kaiser Found. Hospitals*, 17 Cal. 3d 699, 710.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    contract or reject it." *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071 (2003). The undisputed

2    evidence before the Court, as discussed above, shows that Plaintiff had ample opportunity

3    negotiate the terms of the contract, and in fact did negotiate more favorable terms of the contract.

4    *See, e.g.*, Khazen Decl. ¶¶ 14-18. The arbitration clause was not imposed upon Plaintiff by

5    surprise, as Khazen declares that she gave a copy of USIIC's standard engagement agreement,

6    which "had the same substantive terms as the version that [Mohebbi] signed," four months prior to

7    the July 22 meeting where Mr. Mohebbi signed the contract. *Id.* at ¶ 7. This clause is not the type

8    of "take it or leave it" provision that California courts have deemed procedurally unconscionable.

9    *Cf. Flores*, 93 Cal. App. 4th 846, 853-54. Though Plaintiff states in his declaration that he would

10   not have signed the contract had he known that it contained an arbitration agreement and that he

11   was therefore giving up his right to have disputes heard by a court, *see* Mohebbi Decl. ¶ 43, the

12   Court reiterates that Mr. Mohebbi cannot attempt to avoid the terms of a clear and conspicuous

13   arbitration clause merely because he did not speak the language in which the contract was written.

14   *See, e.g.*, *Madden*, 17 Cal. 3d 699, 710.

15        Having found no procedural unconscionability, the Court cannot deem the arbitration

16   clause unenforceable. *See Armendariz*, 24 Cal. 4th 83, 114. That being said, the Court also finds

17   no indication that the arbitration clause was substantively unconscionable. Courts in California

18   have held that an arbitration clause is not unconscionable if there is a "modicum of bilaterality in

19   the arbitration remedy." *Flores*, 93 Cal. App. 4th 846, 854 (citing *Armendariz*, 24 Cal. 4th 83,

20   117). Under the terms of this arbitration clause, either party may enforce the clause against the

21   other, with regard to any dispute "arising out of or relating to this Agreement." ECF 66-9 at 5. The

22   arbitration clause does not mandate a particular procedure "wholly or largely to [one party's]

23   benefit at the expense of the party on which the arbitration is imposed." *Trompeter*, 914 F. Supp.

24   2d 1067, 1073 (citing *Little*, 29 Cal. 4th 1064, 1072). Any and all disputes must go to arbitration,

25   no matter which party brings them. This is not a circumstance, like was the case in *Trompeter*,

26   where the defendant is able to take advantage of multiple remedies while the Plaintiff is limited to

27   arbitration. *Id.* at 1073-74 (finding an arbitration clause substantively unconscionable because the

28   defendant was able to take advantage of self-help remedies and arbitration in the event of a

consumer default, while the consumer was only able to take advantage of arbitration).

The evidence before the Court shows no indication of either procedural or substantive unconscionability, let alone the showing of both required to deem the arbitration provision unenforceable. The arbitration agreement is therefore enforceable.[7]

**C.      Which Causes of Action Fall Within the Ambit of the Arbitration Clause**

The Court now turns to a determination of which of Plaintiff's 22 causes of action fall within the ambit of the arbitration clause. Defendants claim that "Plaintiff has pled himself into a position where the entirety of his action is subject to arbitration" because of his insistence that the claims brought in the SAC are intertwined with one another. *See* Defs.' Mot. to Compel at 6-7 (citing the Court's June 12, 2014 Hearing Transcript in which Plaintiff's counsel stated: "The problem is that all claims are intertwined together"). Plaintiff has made no effort in his Opposition to disaggregate which claims are arbitrable and which are not, instead arguing that "Defendants have failed to demonstrate that the SAC is suing over the engagement agreement at all." Pl.'s Opp. to Mot. to Compel at 25.

The express language of the Engagement Agreement, however, says otherwise: "All disputes arising out of or relating to this Agreement shall be decided by arbitration . . . ." ECF 66-9 at 5. This circuit has made clear that, when an otherwise-valid arbitration agreement includes such broad language, "all doubts are to be resolved in favor of arbitrability." *Simula*, 175 F.3d 716, 721 (finding that the claims in the complaint need only "touch matters" covered by the agreement containing the arbitration provision); *see also Chiron Corp. v. Ortho Diag. Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000). Claims subject to such arbitration agreements include any

---

[7] Though the contract is signed by Ms. Khazen, as CEO of USIIC, *see* ECF 66-9 at 6, the arbitration clause can be enforced by all Defendants because the claims against those Defendants are encompassed by the express terms of the arbitration clause. *See, e.g.*, *EFund Cap. Partners v. Pless*, 150 Cal. App. 4th 1311, 1323 (2007); *see also Michaelis v. Schori*, 20 Cal. App. 4th 133, 139 (1993) (permitting a non-signatory to a contract that included an arbitration clause to enforce the terms of that clause because the clause "sufficiently encompasse[d]" causes of action against him); *Wolf v. Langemeier*, 2010 WL 3341823 (E.D. Cal. Aug. 24, 2010) (holding that a willing non-signatory to an agreement may enforce the arbitration clause contained in the agreement). Here, the arbitration clause broadly encompasses "all disputes arising out of or relating to" the Engagement Agreement, which undoubtedly includes within it claims against other individuals employed by or otherwise affiliated with USIIC.

United States District Court
Northern District of California

claims regarding the contract itself, but extend as far as "tort claims having their root in the contractual relationship." *EFund Cap. Partners*, 150 Cal. App. 4th 1311, 1323.

The Court, however, cannot simply send all claims to arbitration merely because Plaintiff has possibly intertwined arbitrable causes of action with non-arbitrable causes of action. As the Supreme Court held in a recent *per curiam* decision, *KPMG v. Cocchi*, courts must "examine a complaint with care to assess whether any individual claim must be arbitrated." 132 S. Ct. 23, 26 (2011) (per curiam). Those that are arbitrable must be compelled to arbitration, while those that are not arbitrable remain with the Court and must be stayed pending the completion of arbitration. *See* 9 U.S.C. § 3.The Court thus must determine which causes of action "touch matters" covered by the Engagement Agreement.

The causes of action in the SAC can be divided into five groups, which the Court discusses in detail below.

### 1. RICO claims

The first, second, and third causes of action in the SAC are for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*: § 1962(a) (count 1), § 1962(b) (count 2), and § 1962(d) (count 3). These causes of action address an alleged RICO conspiracy outlined in the SAC at paragraphs 214 through 227, discussing a purported criminal enterprise encompassing all Defendants and consisting of alleged "money laundering, mail, and wire fraud, committed by each Defendant." SAC ¶ 219. Plaintiff claims that Defendants engaged in this criminal enterprise in order "to obtain the property of plaintiff and others through illegal conduct." *Id.* Plaintiff includes as a part of this criminal enterprise the alleged misrepresentations that caused him to sign the Engagement Agreement. *Id.* at ¶¶ 219, 221.

The United States Supreme Court has held that RICO claims can be "effectively vindicate[d]" in an arbitral forum, and that "nothing in RICO's text or legislative history otherwise demonstrates congressional intent to make an exception to the [Federal] Arbitration Act for RICO claims." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 242 (1987). Since Plaintiff's RICO claims plainly "touch matters" covered by the Engagement Agreement, as the alleged criminal enterprise to defraud Plaintiff included the Defendants' purported misrepresentations

13

1    regarding the Engagement Agreement, *see* SAC ¶ 219, these three causes of action are arbitrable.

2                2.        *Claims related to the sale of securities*

3          A number of Plaintiff's causes of action concern violations of various state and federal

4    securities laws: Sections 5(a) and 5(c) of the Securities Act (count 4), Section 10(b) of the

5    Exchange Act (count 5), Section 203(a) of the Advisers Act (count 6), and California Corporations

6    Code § 25401 *et seq.* (count 7) and § 25110 (count 8). Plaintiff also brings a cause of action for

7    violations of California Business and Professions Code § 17000 and § 17200 (count 14).[8]

8          "The [Federal] Arbitration Act, standing alone, [] mandates enforcement of agreements to

9    arbitrate statutory claims. . . . The burden is on the party opposing arbitration [] to show that

10   Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."

11   *McMahon*, 482 U.S. 220, 226-27. Courts have found that claims arising under federal securities

12   laws are arbitrable, *see, e.g.*, *id.* at 232-33 (holding that claims under § 10(b) of the Exchange Act

13   were arbitrable); *see also Elliott v. Albright*, 209 Cal. App. 3d 1028, 1036 ("Arbitration is

14   appropriate for claims under the 1933 [Securities] Act."), and have also found that claims arising

15   from California securities statutes are arbitrable, *see, e.g.*, *Wolf v. Langemeier*, 2010 WL 3341823

16   (E.D. Cal. Aug. 24, 2010) (compelling arbitration of two causes of action under § 25110). Courts

17   have further found that causes of action brought pursuant to California's unfair business practices

18   statutes are arbitrable. *See Arriaga v. Cross Country Bank*, 163 F. Supp. 2d 1189, 1199-1200 (S.D.

19   Cal. 2001) *overruled in part on other grounds by Ting v. AT&T*, 319 F.3d 1126, 1150 n.14 (9th

20   Cir. 2003) (finding that claims for relief brought under § 17200 are arbitrable); *Kaltwasser v.*

21   *AT&T Mobility LLC*, 812 F. Supp. 2d 1042, 1050 (N.D. Cal. 2011) (same). Nothing in the

22   language of these statutes expressly precludes arbitration as an appropriate forum for vindicating a

23   plaintiff's claim. *Cf. Mitsubishi Motors*, 473 U.S. 614, 627 ("[T]he [Arbitration] Act itself

24   provides no basis for disfavoring agreements to arbitrate statutory claims.").

25         Plaintiff's claims regarding violations of state and federal securities law, as well as

26   California's Unfair Business Practices Act, all "touch matters" covered by the Engagement

27   _____

28   [8] Count 14 also includes violations of § 17500, California's false advertising statute, which the
     Court addresses in detail below in Part III.C.5.

United States District Court
Northern District of California

1  Agreement. The Engagement Agreement outlined the relationship between the parties that

2  ultimately gave rise to the investment relationship between Plaintiff and USIIC. *See* ECF 66-9 at 2

3  (discussing USIIC's obligation to "identify investment opportunities" for Plaintiff). As such, these

4  securities and unfair business practices claims, arising from Plaintiff's purchase of 1,000,000

5  shares of Tri-Valley Bank, fall within the ambit of the arbitration clause contained in the

6  Engagement Agreement, and are arbitrable.

7  　　　　　　　　*3.    Common law fraud claims*

8  　　　　Plaintiff's SAC includes four claims for various forms of fraud: fraud in the inducement of

9  the Engagement Agreement (count 9), fraud in the execution or inception of the Engagement

10  Agreement (count 10), fraudulent misrepresentation in regard to the October 3 Investment

11  Questionnaire (count 11), and fraudulent misrepresentation in regard to the December 18

12  Agreement (count 12).

13  　　　　A claim for fraud that is related to the contractual agreement as a whole must be decided

14  by an arbitrator. This is different from a claim for fraudulent inducement of the arbitration clause

15  itself, which must be decided by the court. *See, e.g., Prima Paint*, 388 U.S. 395, 408. These four

16  causes of action all relate to contractual agreements as a whole, and are not specific to the

17  fraudulent inducement of an arbitration clause contained within these documents. Neither the

18  October 3 Investment Questionnaire nor the December 18 Agreement contains an arbitration

19  clause. However, claims relating to fraudulent inducement of these two contracts "touch matters"

20  with regard to the Engagement Agreement, and are therefore arbitrable. The Investment

21  Questionnaire expressly outlines the terms of Plaintiff's investment with USIIC, made in order to

22  obtain an EB-5 visa. *See, e.g.*, SAC ¶ 327(3). The December 18 Agreement includes a description

23  of Defendants' purchase of Tri-Valley Bank shares using Plaintiff's investment. *See, e.g.*, SAC ¶

24  371. Both of these investment contracts are specifically contemplated by the Engagement

25  Agreement, which "establishe[d] the terms and conditions of engagement by Saied Mohebbi . . .

26  with the US Immigration Investment Center." ECF 66-9 at 1. USIIC was to identify and review

27  potential investment opportunities for Plaintiff. *Id.* at 1-2. Future contracts that set forth the *actual*

28  investments thereafter made by USIIC fall plainly within the terms of the arbitration clause, which

United States District Court
Northern District of California

instructs all disagreements "arising out of or relating to" to Engagement Agreement to be arbitrated. *Cf. Gross v. Recabaren*, 206 Cal. App. 3d 771, 777 (1988) (compelling arbitration of claims arising after the initial contract was signed, after examining the language of the arbitration clause to determine that "[i]t is manifest that the contract signed by [plaintiff] cannot, on its face, reasonably be said to be limited only to those services provided contemporaneous to its signing"). As such, Plaintiff's fraud claims are arbitrable.

### 4.      Common law contract and tort claims

Plaintiff brings three breach of contract claims: breach of the Engagement Agreement (count 15), breach of the Investment Questionnaire (count 16), and breach of the December 18 agreement (count 17). He also brings a claim for breach of the implied covenant of good faith and fair dealing (count 18), as well as causes of action for diversion of funds (count 19), conversion (count 20), and seeking an accounting and constructive trust (count 22).

Claims for breach of the Engagement Agreement, as well as for breach of the October 3 and December 18 agreements that arose out of the relationship between Plaintiff and USIIC, are arbitrable under the plain language of the Engagement Agreement's arbitration clause. ECF 66-9 at 5 ("All disputes arising out of or relating to this Agreement shall be decided by arbitration."). Similarly, claims for breach of the implied covenant of good faith and fair dealing are arbitrable when the underlying contract claim is arbitrable. *See, e.g.*, *Las Vegas Sands, Inc. v. Culinary Workers Union Local No. 226*, 82 Fed. App'x. 580, 584 (9th Cir. 2003) ("Because the implied covenant claim implicates the entire [contract], arbitration is the proper forum for its resolution."). Plaintiff's claims for diversion of funds and conversion arise out of the funds paid to USIIC consistent with the terms of the three agreements at issue, and are therefore also arbitrable. *See EFund Cap. Partners*, 150 Cal. App. 4th 1311, 1325 ("It has long been the rule in California that a broadly worded arbitration clause, such as we have here, may extend to tort claims that may arise under or from the contractual relationship.") (citing *Coast Plaza Doctors Hosp. v. Blue Cross of Calif.*, 83 Cal. App. 4th 677, 685-86 (2000)). Plaintiff's claim seeking an accounting and constructive trust also arises out of his contention that Defendants' violated the fiduciary relationship they owed him by virtue of the contracts signed between the parties. *See* SAC ¶ 443.

Thus this claim is also subject to arbitration, as it relates directly to the Engagement Agreement.

>  5.   *Claims Not Subject to Arbitration: False Advertising and Rescission*

Plaintiff brings two causes of action alleging false advertising: violation of the Lanham Act (count 13) and § 17500 of the California Business and Professions Code (part of count 14). Plaintiff also brings a claim for rescission of the arbitration clause, which asks the Court to find that the clause was void because it was procured by fraud (count 21).

>  a.   *False Advertising*

Plaintiff's false advertising claims relate to the alleged misrepresentations made by Defendants on USIIC's website, *see, e.g.*, SAC ¶ 229, and include his allegation that USIIC misrepresented itself as a qualified Regional Center designated by the USCIS for the purpose of assisting investors in applying for EB-5 visas. *See* SAC ¶ 231. Though false advertising claims are arbitrable, *see Kaltwasser*, 812 F. Supp. 2d 1042, 1050, this alleged false advertising, and Plaintiff's purported reliance on it, occurred *prior* to his signing of the Engagement Agreement with USIIC. Because the arbitration clause does not explicitly encompass claims that predate the signing of the Engagement Agreement, Plaintiff's false advertising claims are not arbitrable. *See, e.g.*, *Morse v. Servicemaster Global Holdings, Inc.*, 2012 WL 4755035, at *5 (N.D. Cal. Oct. 4, 2012) (holding that the language of an arbitration agreement must be "retroactive on its face" to encompass claims that predate the execution of the arbitration agreement).

>  b.   *Rescission*

Plaintiff's claim for rescission (count 21) is merely a request that the Court find that the arbitration clause *itself* is unenforceable because it was procured by fraud. *See* SAC ¶ 440 ("Plaintiff seeks a finding of rescission and that the [arbitration] clause was invalid ab initio due to fraud . . . ."). Unlike a claim for rescission of the contract as a whole, a claim seeking only rescission of the arbitration agreement is not arbitrable; rather, under the FAA, such a claim is adjudicated by the Court. *See* 9 U.S.C. § 4 (stating that the Court shall "hear and determine" issues regarding the making of the arbitration clause); *Rosenthal*, 14 Cal. 4th 394; *Chiron*, 207 F.3d at 1126, 1130.

As the Court has discussed at length above, *see supra* Part III.B, the arbitration clause is

United States District Court
Northern District of California

enforceable because Plaintiff has failed to put forth sufficient evidence to carry his heavy burden to show that the arbitration clause itself was fraudulently induced. By finding the arbitration agreement validly entered into, and granting Defendants' motion to compel arbitration, the Court has adjudicated Plaintiff's twenty-first cause of action for rescission, and found it without merit. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1269 (2006) ("[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it.") (citing *Prima Paint*, 388 U.S. at 403-04).

In *Abreu v. Slide, Inc.*, a court in this district was faced with a similar situation as here: a party's complaint included a number of causes of action that fell within the ambit of an arbitration clause, but also included a single cause of action challenging the validity of the arbitration clause itself. 2012 WL 2873772 (N.D. Cal. July 12, 2012) (adjudicating both a motion to dismiss and a motion to compel arbitration). The court in *Abreu* treated the claim challenging the validity of the arbitration agreement in the same manner as this Court has – by determining whether or not the arbitration agreement was valid. *Id.* at *4-5. Determining that the arbitration clause was validly entered into, the *Abreu* court compelled arbitration, which adjudicated the entirety of plaintiff's claims regarding the validity of the arbitration clause. *Id.* at *6 (sending all claims to arbitration, including any claim to the contract "unrelated to the validity of the arbitration provision").

Since Plaintiff's entire twenty-first claim involves his challenge to the arbitration clause, *see* SAC ¶ 440 ("Plaintiff seeks a finding of rescission and that the clause was invalid ab initio due to fraud), the Court's determination that the arbitration agreement was validly entered into disposes of Plaintiff's claim for rescission. As such, Plaintiff's claim for rescission is DISMISSED. *See* 9 U.S.C. § 4 (stating that the Court shall "determine" any issue regarding the making of an arbitration agreement).

### D.     Defendants' Motion to Dismiss

Defendants also move to dismiss nearly all of Plaintiff's claims: his first through

United States District Court
Northern District of California

United States District Court
Northern District of California

nineteenth causes of action, as well as his twenty-first and twenty-second causes of action.[9]

### 1.    Plaintiff's Claims Subject to Arbitration

The Court declines to consider Defendants' motion to dismiss with regard to all causes of action that the Court has ordered are subject to arbitration: the first through twelfth causes of action, the § 17000 and § 17200 claims in the fourteenth cause of action, the fifteenth through twentieth causes of action, and the twenty-second cause of action. *Cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627; *Buckeye Check Cashing*, 546 U.S. 440, 446.

### 2.    Plaintiff's Lanham Act Claim

Because Plaintiff's false advertising claims are not subject to arbitration, the Court must consider Defendants' motion to dismiss Plaintiff's Lanham Act claim.[10]

Plaintiff's Lanham Act claim is brought under section 43(a), which requires the Plaintiff to plead five elements:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

Plaintiff outlines the facts pertaining to his Lanham Act claim in paragraphs 228 through 239 of the SAC. In this section, Plaintiff reiterates his argument that USIIC made a false statement about its status as an EB-5 Regional Center and the speed with which it could help its clients achieve residency in the United States:

> U.S. Immigration Investment Center (USIIC) is the only EB-5 Regional Center organization with its foundation in United States banking.  USIIC is an EB-5 organization assisting VIPs, entrepreneurs, and successful professionals from around the world to invest in the recapitalization of U.S. Community and Private Banks and create or preserve jobs while achieving the fastest path to U.S.

---

[9] Plaintiff's eighteenth cause of action for conversion survived Defendants' first motion to dismiss. *See* ECF 64 at 29-30.

[10] The Court previously dismissed this claim with leave to amend. *See* ECF 64 at 31-32. Plaintiff's § 17500 claim, however, survived Defendants' first motion to dismiss. *See* ECF 64 at 33.

residency and citizenship.

SAC ¶ 229.

Plaintiff later states that "Defendants knew or should have known that USIIC was using the Internet and advertised falsely its services as 'to obtain the fastest path to U.S. residency through its regional centers and the Limited Partnership, created specifically for each EB-5 Regional Center project.'" SAC ¶ 391.

"[A] false advertising cause of action under the [Lanham] Act is not limited to literal falsehoods; it extends to false representations made by implication or innuendo." *Cook, Perkiss & Liehe, Inc. v. No. Calif. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990). Plaintiff contends that USIIC falsely advertised its services by insinuating that it was a USCIS-approved EB-5 Regional Center, through its use of the phrase "only EB-5 Regional Center organization," and thus induced Plaintiff to sign the Engagement Agreement and purchase securities. Unlike in the FAC, where Plaintiff made a single conclusory statement regarding Defendants' false statements about "advertis[ing] the offering and sale of securities," *see* FAC, ECF 29 ¶ 198, Plaintiff in the SAC alleges that Defendants' falsehood was with regard to the services it provided to EB-5 applicants, and that a knowingly false statement about its status as an approved EB-5 Regional Center would prevent USIIC from providing Plaintiff the services it otherwise promised.

A false statement about the character of the company providing a service is sufficient to state a claim under the Lanham Act. *See, e.g.*, *Cook*, 911 F.2d 242, 245 ("NCC makes one overt statement about its own services on its advertisement: '[W]e're the low cost commercial collection experts.'"). The Court finds Plaintiff's pleading sufficient for purposes of stating a claim under the Lanham Act. Plaintiff pleads the existence of a false statement about a service, actual deception that was material to Plaintiff's purchase, the existence of the statement in interstate commerce (where the statement was written on USIIC's website and accessed by Plaintiff in Iran, *see* SAC ¶ 21), and resulting injury. SAC ¶¶ 232-239.

As such, Defendants' motion to dismiss Plaintiff's Lanham Act claim is DENIED.

**E.      Defendants' Motion to Stay the Litigation Pending Arbitration**

Pursuant to the Federal Arbitration Act, when a court determines that some claims are

United States District Court
Northern District of California

20

arbitrable while some are not, the claims that are not arbitrable must be stayed pending the completion of arbitration. 9 U.S.C. § 3 ("[The Court,] on application of one of the parties [must] stay the trial of the action until such arbitration has been held in accordance with the terms of the agreement."). As such, Plaintiff's false advertising claims in counts 13 and 14 must be stayed pending the completion of arbitration as to the remaining claims.

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.    Defendants' motion to compel arbitration is GRANTED as to counts 1 through 12, the § 17000 and § 17200 claims in count 14, counts 15 through 20, and count 22. Defendants' motion to compel arbitration is DENIED as to count 13 and the § 17500 claims in count 14.

2.    Defendants' motion to dismiss count 13 is DENIED. Defendants' motion to dismiss count 21 is GRANTED. The Court DECLINES TO RULE on the remainder of Defendants' motion to dismiss because the remaining claims have been compelled to arbitration.

3.    Defendants' motion to stay the litigation as to counts 13 and the § 17500 claims in count 14 is GRANTED.

4.    The parties are FURTHER ORDERED to file with the Court, no later than December 4, 2015, a two-page letter updating the Court as to the status of arbitration.

**IT IS SO ORDERED.**

Dated: December 4, 2014

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California